SMITH *et al. v.* DOBBINS.

1. Where several executions in favor of different plaintiffs have been levied on the same property, and one person has filed in resistance to each levy a separate claim, and the claim cases thus made are pending in court, all involving the same question, and it being one upon the decision of which the subjection or non-subjection of the property to all the executions depends, an equitable petition will lie in favor of the claimant against all the plaintiffs jointly, to bring to trial all of the claims together, and dispose of them by one verdict and judgment.

2. An agreement between an insolvent debtor whose land is about to be sold at sheriff's sale under execution, and another not a party to the same, to the effect that the latter will purchase the land and give the former a year's time to refund the purchase money with interest, and thereupon convey to him the land, the plaintiff in *fi. fa.* not participating in the agreement, is not *per se* fraudulent as against the debtor's creditors. Nor is such agreement rendered fraudulent by a stipulation that the debtor should have the crop then upon the land without paying for it, nor by a stipulation that the succeeding year's crop should be the property of the purchaser at the sheriff's sale in case the debtor failed to take the land and pay for it within the time agreed upon.

3. After the purchase of the land at the sheriff's sale, in pursuance of the agreement above set forth, the purchaser was the exclusive owner thereof, and the debtor had no interest in it subject to levy and sale. That the purchaser extinguished the debtor's right to pay for and take the land by paying him, or his assigns, a consideration for such extinguishment, was not a fraud upon his creditors, the debtor having paid nothing whatever for such right, nor upon the agreement out of which it sprang.

May 27, 1891.

Equity. Debtor and creditor. Fraud. Contracts. Levy and sale. Before Judge MILNER. Bartow superior court. January term, 1890.

Dobbins by his bill filed June 11, 1887, alleged the following : Sometime previous to the first Tuesday in October, 1881, one Burkhalter had bargained with W. T. Wofford, then in life, to sell Wofford certain land (describing it), and for the purchase price of the land Wofford had given Burkhalter his promissory notes, taking Burkhalter's bond for titles. Wofford

paid a part of the purchase money, and having failed to pay the balance, Burkhalter brought suit therefor, obtained judgment and had execution levied upon the land, after filing his deed to Wofford in the office of the clerk of the superior court. After due advertisement the land was sold by the sheriff, under the levy, on the first Tuesday in October, 1881, at public outcry to the highest bidder, and was knocked off to complainant for $4,150, which he paid, and the sheriff made him a deed. On the same day and after the sale, Wofford asked him for a chance to buy the land back, and he agreed with Wofford to allow him to do so at the amount of his (complainant's) bid and eight per cent. interest per annum, to be paid by October 4th following, which agreement was reduced to writing, and a copy of it is annexed to the bill. Shortly before the last named date, Wofford found he was unable to pay, and transferred all his rights under the contract to T. R. Jones, who was his creditor, the consideration of the transfer being the settlement of a note for $800 held by Jones aginst Wofford, and the payment of $800 by Jones to Wofford. On September 23, 1882, Jones presented to complainant the writing obtained by him from Wofford, and complainant, desiring to hold the place, paid Jones $1,200 for the relinquishment of all Jones' rights under the writing and took a transfer of it. All the transactions above mentioned were in good faith and with no intention on complainant's part to wrong any one, and he believed and believes neither Wofford nor Jones had any intention to wrong any one. Complainant had gone into possession shortly after the sheriff's sale, was in possession when he purchased Jones' rights, and from that time on had so remained. After he had been in possession over two years and had made valuable improvements, J. M. Smith, having on January 11, 1883, obtained a judgment against Wofford, had a *fi. fa.*

issued and levied on a portion of the land, to which
complainant filed his claim, which claim was tried and
a portion of the property was found subject, and com-
plainant moved for a new trial which was granted. Af-
terwards, on September 1, 1886, a *fi. fa.* in favor of
M. L. Johnson against the executrix of Wofford, one in
favor of the same person against Wofford, and one in
favor of the same person as guardian against Wofford,
were levied on the land, and complainant filed separate
claims which were returned to court and are now pend-
ing.    On January 24, 1887, a *fi. fa.* in favor of Satter-
field against W. T. Wofford as principal, and J. C.
Wofford as endorser, was levied upon the same land,
and to this complainant filed his claim which was re-
turned to court, where it is now pending, but since the
claim was filed Satterfield has died intestate and there
is no administration on his estate, for which reason his
estate is not made a party defendant.    Plaintiffs in
these various *fi. fas.* claim that complainant procured
his title in fraud of the rights of creditors of W. T.
Wofford, who died May, 1884, leaving his estate utterly
insolvent, and besides the *fi. fas.* named there are a num-
ber of others which will probably be levied so as to put
complainant to the annoyance and expense of a number
of trials, unless this bill is sustained compelling all of
the issues to be tried and disposed of therein.    All the
charges of fraud are denied by complainant; he had
every reason to believe and did believe that the sheriff's
sale was fair and open and nothing done to deter any
one from bidding ; he entered into his agreement with
Wofford after the sale, being moved by appeals being
made to him by Wofford and out of kind feelings ex-
cited by these appeals, and without any hint from Wof-
ford that he desired or intended by such arrangement
to hinder, delay or defraud his creditors, nor was the
true status of the matter sought to be kept secret, but

it was all done honestly that Wofford might, if he could, procure the money to buy the land back, which, if he had done so, would have been to the benefit of his creditors. The land brought its full cash value at the sheriff's sale, and since he bought it complainant has put upon it valuable improvements to the extent of about $5,000, nearly all of which were made before the above mentioned levies, and without notice on his part that any one would or could question the validity of his title. He charges that said creditors have conspired for the purpose of annoying and harassing him, hoping to induce him to pay them considerable sums of money to buy his peace. As his remedy is less adequate at law than in equity, and in order to avoid the delay, expense and trouble of a multiplicity of suits and so many separate trials involving the same issues, he prays that each of the plaintiffs in *fi. fa.* be enjoined from proceeding with the claim cases and be compelled to submit their alleged rights to adjudication under this bill; that the rights of all parties be settled by final decree under it; that so soon as the estate of Satterfield is represented, he have leave to amend his bill by making the administrator a party defendant; for temporary restraining order, perpetual injunction, general relief, etc. He waived discovery. Exhibited with the bill was a copy of the agreement made between Dobbins and Wofford, the transfer to Jones, and the transfer by Jones to Dobbins. The agreement was signed by Dobbins, dated October 4, 1881, and recited that Dobbins that day had bought the land, which contained 1,200 acres, more or less, and that day went into possession of it, "but except the present crops, with the understanding that any tenant I may rent to have the right to sow grain and grass of any kind and make any other improvement I, the said Dobbins, may think proper for the preparation of crops for the ensuing year"; and that

should Wofford pay to Dobbins, or his legal represent-
atives, $4,150 with interest from date at eight per cent.
per annum, on or before October 4, 1882, the crops then
on the lands being reserved to Dobbins with the right
to remove them, Dobbins would make to Wofford or to
his legal representatives or assigns quit-claim deed to
the land.    Upon this agreement was an order from
Wofford to Dobbins to make to Jones a deed to the
land on Jones paying Dobbins the $4,150 and interest,
dated September 22, 1882.    Also, the transfer by Jones
to Dobbins, which was "for value received" and was
dated September 23, 1882.

The defendants demurred on the grounds that there
was no equity in the bill; that it was multifarious;
that complainant had a full, adequate and complete
remedy at law, and the facts alleged showed that a
court of law had already taken jurisdiction of the cases,
and the case of Smith was pending on writ of error in
the Supreme Court, so that of that case the superior
court no longer had jurisdiction; and that the bill was
filed since 1885, and under the law as it stood when it
was filed and now, even if complainant were entitled to
relief, he could have obtained it by proper pleadings in
any one of the claim cases.    The defendants answered,
in brief, as follows : The alleged judgment of Burk-
halter was a nullity, because it was granted by the court
without a verdict when an issuable plea under oath was
on file, and all the sales or proceedings under it are
void and did not divest Wofford's title. The lands were
bid off at the sheriff's sale by Dobbins for $4,000, and
he paid $4,150 under the fraudulent scheme.    The
agreement between Dobbins and Wofford was made
before the sale, though it may have been put in writing
afterwards.    Jones did relinquish his rights to Dobbins,
but on the basis of $1,600 instead of $1,200, and Dob-
bins did not act in good faith in this matter.    When

the bill was filed the grant of a new trial in the case of
Smith against Dobbins, claimant, had been excepted to,
and the case was pending in the Supreme Court, and
therefore the superior court had no jurisdiction of that
case.    The estate of Satterfield had no interest in the
Satterfield *fi. fa.*, as J. C. Wofford, before Satterfield's
death, as endorser, paid Satterfield the money due on
the *fi. fa.*, and it is now proceeding for the benefit of
J. C. Wofford.    W. T. Wofford is dead and his estate
is insolvent, and he was insolvent October 4, 1881. The
land did not bring its value at the sheriff's sale by
$2,000 or more.    If Dobbins made improvements on it
he did not make them in good faith, as he had full
notice of the worthlessness of his title.    There has been
no conspiracy among defendants, but they antagonized
each other, each claiming priority if the property is
subjected.    Before the sheriff's sale Dobbins, Burkhal-
ter and W. T. Wofford agreed, in fraud of all other
creditors of Wofford, that the land be sold and that
Dobbins should bid it off, and whatever his bid might
be he should pay Burkhalter his debt and give Wofford
twelve months in which to redeem the land, both Dob-
bins and Burkhalter knowing at the time that Wofford
was insolvent and that the land was worth $7,000. This
combination was not only known and rumored among
the bystanders at the sale, but Burkhalter told several
persons that the sale would be for Wofford's best in-
terest, and Wofford, before the sale, told others that the
arrangement had been made.    By this means bidding
was depressed, only one bid being made, which was
Dobbins' at $4,000, and while the sheriff was crying
this, Dobbins, Wofford and Burkhalter, a few feet off,
had a consultation in which Burkhalter complained
that the bid was not enough to pay his debt, and the
other two both assured him that, if the property was
knocked off to Dobbins at that bid, his debt should be

paid in full; and Burkhalter allowed the sale to proceed, which he would not have done but for this assurance, which was simply carrying out the fraudulent scheme; and in further pursuance of it, on October 4, 1881, Dobbins paid Burkhalter $150 in addition to the bid of $4,000 and gave Wofford the writing. While the sheriff's deed was recorded, the right of redemption left in Wofford, which was worth $1,600, has never been recorded, which was a fraud on Wofford's creditors. The scheme did hinder, delay and defraud the creditors of at least $800, which went into Wofford's pocket and which they could not reach, so 'that the scheme is a fraud and void as to the whole property, and as against the creditors Dobbins cannot hold it. Defendants pray that the sheriff's deed be cancelled, and the property ordered to be sold and the proceeds distributed among the creditors of Wofford according to their priority. They further allege that Dobbins, and since his death his estate, was liable to them for rents and profits of the land, amounting to $500 a year, and pray that an accounting be had as to the amount thereof, which should be decreed to be a lien upon the land.

The case made by the bill and answer was referred to a master who reported, in brief, as follows: He overruled the demurrer. There were proved before him the judgments of M. L. Johnson, both individually and as guardian, of Satterfield, now J. C. Wofford's, and of Smith. The judgment of Johnson as guardian was rendered October 3, 1881, of Johnson individually, August 10, 1881, of Satterfield November 23, 1881, and of Smith January 11, 1883. These judgments now amount to $5,649.92. The testimony failed to establish an intention on the part of either Wofford or Dobbins to defraud Wofford's creditors. The estimates of all the witnesses, reduced to an average, would put the value of the property, at the time Dobbins bought it, at a

little less than $5,000, so that it may be seriously doubted whether Dobbins did not pay full value. The agreement between Wofford and Dobbins was made before the sale, and by reason of it Dobbins paid, at the end of the twelve months, $1,200 in addition to what he had before paid on the land, making the cost of the land to him $5,350, which was its full value. The agreement allowing Wofford to redeem the property did not render the sale void, there being no intention upon Wofford's part to defraud his creditors, known to or participated in by Dobbins. Wofford tried, before the sale, to get others of his creditors to pay off the purchase money and take the land on their claims against him. He made no secret of the agreement, but after the sale told it to different creditors of his, among them J. C. Wofford, and tried to get them to furnish the money to redeem the land and take it on their debts, and finally did procure one of them, Jones, to do so. While the agreement to redeem was not put on record, there is no law authorizing such record, and there is little probability that if it had been put on record it would have done any good. Wofford did nothing that could be construed into a want of good faith, and was moved, both before the sale and afterwards, by a desire to prevent the sacrifice of his property so far as he lawfully could ; and the fact that $800 in cash was paid in by Jones does not affect the transaction. No person was prevented from bidding, either from sympathy with Wofford or from any other reason. That Wofford realized $1,600 by sale of his right to redeem, would not warrant a decree to that extent, or to the extent of $1,200, the amount paid by Dobbins for the transfer to himself of that right, in favor of the creditors, since the judgments of the defendants were no lien on the interest of Wofford under his agreement with Dobbins. Wofford's rights were simply an option on the prop-

erty; he was not liable to be called on to pay anything and could pay or not as he chose, and had paid nothing on the purchase or option price at all; hence his equity was a naked equity upon which a judgment against him took no lien, and there was nothing to prevent his selling the equity as he might have sold a promissory note, and the purchaser got it free from any lien or encumbrance in favor of judgment creditors. The trade with Jones was a fair and honest transaction, and he got all Wofford's right free from any encumbrance, and could and did convey the same to Dobbins for value. If the sale by Wofford to Dobbins were but a private sale, yet, if it were an honest sale and the purchase of Dobbins were in good faith, the land would not be subject to defendants' judgments. There was nothing in Dobbins' conduct inconsistent with entire good faith under the law. The fact that he may have got the land at less than its value and knew Wofford's insolvency and expected to get the land at the price he did, would not invalidate his purchase. If a private sale were made, those having judgments against the seller would have four years in which to levy their executions or lose their liens; hence, if this were a private sale, these judgment creditors lost such rights as they had, by failure to levy on the property for more than four years after it went into the hands of Dobbins. And if the purchase was in good faith, it would be difficult to find a reason why the land should be subject to the judgment of Smith, the sale having been made before Smith began suit against Wofford. The deed of Dobbins is not void for usury, the fact that Dobbins, under the contract with Wofford, was to be repaid his money with eight per cent. interest and in addition to have the crops grown on the land for 1882, not making it so.

All the testimony which was introduced before the master seems not to have been sent up in the record.

The deed by the sheriff to Dobbins was an ordinary sheriff's deed, and recited a consideration of $4,000. It was made October 4, 1881, and recorded October 5, 1881. Burkhalter's deed to Wofford was made May 3, 1881, and recorded May 4, 1881. The contract between Dobbins and Wofford was put in evidence. Dobbins testified, in brief, that the bidding at the sheriff's sale commenced at about $2,000, and witness ran the property up to $4,150 and it was knocked off to him at that sum, and he paid the money and the sheriff made him a deed; that no arrangement about the land was made between him and Wofford before the sale, and he never saw Wofford at the sale at all; that he never had any conference before the sale with Wofford or Burkhalter about buying the land in for Wofford, and never heard that such a thing was claimed to be true until after the levy of the Smith *fi. fa.;* that he never did or said anything, or heard anything said by anybody, or saw anything done by anybody to deter bidders or depress the bidding; that after the sheriff had made him the deed, Wofford came and asked him for a chance to get the property back and get more for it if he could, and he told Wofford that he would let him pay back the purchase money, $4,150, with eight per cent. interest per annum, if he would do so by the 4th of the following October, and would make Wofford a quit-claim deed to the land, but he (Dobbins) was to have the crop to be grown on the land for that year and the right to take it away, to which Wofford agreed and the writing was executed; that just before the time for Wofford to redeem had expired, Jones came to witness with the paper witness had given Wofford, with the written request on it from Wofford that Jones be allowed to pay the money and for Dobbins to make the deed to Jones; that Jones did not pay the $4,150 with interest, nor tender it, nor offer to pay it, but witness proposed to give

Jones $1,200, for such rights as might be secured to Wofford by the paper, and he did pay Jones that sum and Jones transferred the paper to him; that witness thought the land brought its value at the sale, but after the sale Burkhalter said he had lost $150 by not having run the land high enough to cover his debt, but witness would not have bid any more and said so at the time; and that witness has improved the land to the extent of about $5,000.  It appeared from the documentary evidence that the bid made by Dobbins and the amount paid by him to the sheriff was $4,000, but that he paid Burkhalter $150 in addition, on the day of the sheriff's sale.  There was further evidence tending to show that $4,000 was full value for the property at the time of the sale, for a cash sale; that persons were not deterred from bidding; that the character of Wofford and Dobbins for honesty was good; that Dobbins' improvements to the place would amount to about $5,000; that the rent of the place at present is worth $500 a year, but was only worth $200 to $300 in 1881; that the only plea filed in the suit of Burkhalter against Wofford was that the note on which Burkhalter sued would not draw more than seven per cent. after its maturity, as matter of law; that Wofford tried to get one Veach, who was a creditor of his, to buy the land to make his (Veach's) money, but Veach would not have given $4,000 for it, the place being in bad condition; that Wofford said nothing to Veach about depressing the bidding at the sale; that the farm was advertised for sale under the Burkhalter *fi. fa.* when Wofford tried to get Veach to buy it, and while Wofford's plan was not fully unfolded to Veach, if he had any other plan than to enable Veach to save his debt, Veach did not remember it; that he had before that time solicited Veach to furnish him money to pay his debts, giving him an inventory of his assets; that in 1881, Wofford was very

much embarrassed, but thought he was solvent, and if his property had been worth as much as he estimated it, he could have paid his debts and had property left; that Veach thought then he was solvent, but from what he learned afterwards changed his opinion.  From the testimony of Jones it appeared that the consideration of the transfer to him by Wofford of the written agreement between Dobbins and Wofford was $6,000, of which he was to pay Dobbins $4,400, the amount Wofford then owed Dobbins for the property, and the balance of $1,600 was made up of two items, $800 in money, which he paid Wofford, and $800 which he paid Wofford in a note Wofford owed him.  On the day after the transfer was made to him Jones transferred the writing and all his interest to Dobbins for $5,600, that is, for the difference between the $4,400 which he owed Dobbins, and $5,600 which Dobbins gave him, in other words, $1,200 was paid him in cash by Dobbins. The Smith *fi. fa.* was levied on the property March 26, 1884, the *fi. fas.* of Johnson, and Johnson guardian, on September 1, 1886, and the Satterfield *fi. fa.* on January 24, 1887.

The defendants excepted to the master's report on the following grounds :

(1) The master erred in overruling the demurrer.

(2) The master did not decide on all the issues made in the answer, one of the issues made being that the property, or a sufficiency thereof, should be found subject to raise the sum of $800 which was paid to Wofford, and by the action of Dobbins was withdrawn from Wofford's creditors, Dobbins having put it into the power of Wofford to withhold said sum from his creditors.

(3) The master erred in holding that the making of the agreement before the sale was not a fraud in law and fact on the then existing creditors of Wofford.

(4) He erred in not holding, under the circumstances under which the contract was made and the rumors of the contract among the bystanders that the sale was being had for Wofford's benefit, that the sale was fraudulent and void and the whole of the land subject as to the existing creditors of Wofford.

(5) He erred in holding that the contract did not give Wofford such an interest in the land as was subject to levy and sale, but only gave him a naked equity; and in not finding that the contract gave to Wofford the crop then on the land, which was worth at least $250.

(6) Because he did not find on the issue as to whether or not Dobbins was liable to the creditors of Wofford for the value of said crop, Dobbins having put it into the power of Wofford so to defraud his creditors.

(7) Because he did not find that the land was subject to the executions of defendants to the extent of the value of the contract or equity of redemption as proved, $1,600, or at least to the value of $1,200.

(8) Because he found that the sale of October 4, 1881, was not a private sale and void on account of usury.

(9) Because he reports that the bar of four years would have precluded defendant, Johnson, even if it had been a private sale.

(10) As an exception of fact, because the master found that the contract was a naked equity, when the only evidence on the question was by the contract itself, which conveyed the crop then on the land, which, as the master reports, was worth $250; and the testimony of Jones shows that it was worth $1,200 or $1,600 and that Dobbins paid him $1,200 cash, and $400 being the interest due from Wofford to Dobbins, and Dobbins himself so swore.

The exceptions were overruled and the master's report confirmed, and the defendants excepted.

A. S. JOHNSON, for plaintiffs in error.

M. R. STANSELL, *contra.*

LUMPKIN, Justice.

The facts of this case are set forth in the reporter's statement.

1. The doctrine is well established that equity will interfere to restrain the bringing of a multiplicity of suits when the rights of all concerned may be adjudicated without prejudice to any in a single proceeding, and there is no reason in principle why this rule should not be applied to cases already brought and pending by consolidating them into a single case. In 1 High on Injunctions, §12, we find the following: "Where there is one common right in controversy which is to be established by or against several persons, one person asserting the right against many, or many against one, equity may interfere, and instead of permitting the parties to be harassed by a multiplicity of suits, determine the whole matter in one action." See, also, 2 High on Injunctions, §1406; Story on Eq. Pl. §286; and Wait on Fraud. Con. §§151, 152, and cases there cited. The doctrine is fully discussed in 1 Pomeroy's Eq. Jur. §§255 *et seq.* In §269 is the following: "Under the greatest diversity of circumstances, and the greatest variety of claims arising from unauthorized public acts, private tortious acts, invasion of property rights, violation of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may and should be exercised either on behalf of a numerous body of separate claimants against a single party, or on behalf of a single party against such a numerous body, although there is no 'common title,' nor 'community of right,' or of 'interest in the subject-matter,' among these individuals, but where there is and because there is merely a community of interest among

them in the questions of law and fact involved in the
general controversy, or in the kind and form of relief
demanded and obtained by or against each individual
member of the numerous body." See, also, §274.

In *Orton et al.* v. *Madden et al.*, 75 *Ga.* 83, it was held
that equity "will entertain a bill to avoid a multitude
of suits by establishing a right in favor of or against
several persons which is likely to be the subject
of legal controversy, or in similar cases." And see
*Johnson & Co.* v. *O'Donnell & Burke et al.*, *Id.* 453. In
the case of McHenry v. Hazard, 45 N. Y. (6 Hand)
580, it appeared that an obligation was obtained from
the plaintiff by fraudulent representations. A. and B.
both claimed to own it by assignment. Each com-
menced an action against him, and claimed in hostility
to each other, and it was held that he might, during
the pendency of the actions against him, bring a sep-
arate suit against both claimants to be relieved from
the contract on the ground of fraud therein. Andrews,
J., delivering the opinion of the court, observed that
"It was a prominent motive, in constituting a single
court having jurisdiction in law and equity, to remedy
the inconvenience, which existed when legal and equi-
table remedies were administered by separate tribunals,
of obliging parties to resort to two courts to determine
rights connected with a single transaction," and that
conferring such power upon the court was "designed to
prevent unnecessary litigation, and to enable parties to
bring into one suit all the elements of the controversy
for the purpose of a complete and final adjudication."
Again, in the case of the Board of Supervisors of Sara-
toga Co. *v.* Deyoe, 77 N. Y. 219, it appeared that a
county treasurer, under authority to issue notes for
money advanced to the county for a certain amount,
had fraudulently issued notes for a much larger amount.
Some of the claims against the county were valid, while

others were not.  Thirty-one persons holding these
notes had brought separate actions thereon against the
county, and others intended to do so.  The petition
brought at the instance of the county alleged that it
could not be ascertained who were the rightful owners
of the debt owing by the county, or how much thereof
was due to either of the holders of the notes, and that
separate litigation with each would subject the plaintiff
to great expense.  Upon demurrer to the complaint, it
was held that the plaintiff was entitled, upon equitable
principles, to implead the holders of the notes for the
purpose of having their respective rights and the lia-
bility of the county determined in one action; that the
claims were of the same general character, and the ac-
tion was maintainable for the purpose of preventing a
multiplicity of suits.

In reply to the suggestion that the plaintiff in the
present case should not be allowed to consolidate all
these claim cases into one, because he himself was re-
sponsible for their existence, he having filed his claim
to the property in every instance where a levy thereon
was made, which he was not absolutely compelled to
do, it may be said that in filing such claims he only
availed himself of one of the methods which the law
gave him for the protection of his alleged rights.  The
fact that he resorted to a statutory remedy in each case
should not, we think, deprive him of the more valuable
remedy in equity of having all this litigation termi-
nated by a single verdict and judgment, the more espe-
cially as so doing could in no way injure any of the
parties.  Whether or not the agreement between him
and Wofford constituted such a fraud upon Wofford's
creditors as would invalidate Dobbins' title to the land,
was a question involved in all the claim cases, and was
a vital one in each.  Upon its determination depended,
in every one of these cases, the subjection or non-sub-

jection of the property; and we are unable to perceive why, in justice and upon principle, this question should not be determined once for all, and thus finally settle in one judgment, without having numerous, tedious and expensive trials, the rights of all these parties.

2. We do not think that such an agreement as is set forth in the second head-note was necessarily fraudulent as against the creditors of Wofford. It was not shown that Burkhalter, the plaintiff in execution, participated therein. There was no binding obligation on Wofford's part to redeem the land by paying back the purchase money with interest, and Dobbins would have had no power to compel a performance of this agreement by Wofford. It was simply a privilege of which the latter might or might not avail himself, as he chose. Considered even as a bond for titles, no part of the purchase money was paid by Wofford, and he therefore had no leviable interest in the land. To make such an agreement fraudulent on the creditors, it must have been intended to defraud them, the object, and not the effect of the agreement, being the true test of its validity. Upon this question the master reports that Wofford's whole conduct was a laudable effort to cause his property to bring full value for the benefit of his creditors; and he further reports that there was no fraud whatever throughout the entire transaction in the conduct of Dobbins. The fact that Dobbins agreed that Wofford should have the crop upon the land at the time of the sale, could not invalidate his title to the land itself; and if, by this arrangement, the title to the crop passed into Wofford, it was subject to executions against him, and the creditors could have had it levied upon. The agreement that, in case Wofford failed to redeem the land within the time agreed upon, the succeeding year's crop should be the property of Dobbins, was entirely immaterial, because the same would have been

his, as the owner of the land, without any such agreement.

3. The master having found that the title of Dobbins to the land in controversy was wholly free from fraud, such finding negatives the liability of the property to be subjected to any part of the debts of the plaintiffs in *fi. fa.* or any of them. The fact that Wofford transferred his right to pay for and redeem the land to another, to whom Dobbins paid a valuable consideration for the extinguishment of this right, could not, under the facts of this case, be a fraud upon the creditors of Wofford. He had paid nothing whatever for this right, and it appears to have been a mere gratuity to him on the part of Dobbins. In the absence of actual fraud, and of any intention on the part of Dobbins, Wofford or Burkhalter to injure the several plaintiffs in execution who sought to subject this land as the property of Wofford, the fact that Dobbins donated, without valuable consideration, a privilege to Wofford which the latter afterwards sold for money, and which Dobbins purchased from Wofford's transferee, does not, in our opinion, affect the honesty or legality of Dobbins' title to the land.        *Judgment affirmed.*